

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

## No. 08-24-00012-CR

---

Nicholas Negrete Peters, Appellant

v.

The State of Texas, Appellee

---

**On Appeal from the 243rd District Court**
**El Paso County, Texas**
**Trial Court No. 20180D05365**

---

## MEMORANDUM OPINION

Nicholas Negrete Peters appeals his convictions for murder and aggravated assault family violence.[1] On appeal, Peters contends the evidence at trial was insufficient to prove he did not act in self-defense as to each charge; and, in several other issues, he challenges rulings made during trial and post-verdict. Finding no reversible error, we affirm.

---

[1] *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 22.02(a)(2).

# I. BACKGROUND

## A. The factual background

The two-count indictment against Peters alleged he murdered Dimitri Pacheco, and that he committed aggravated assault with a deadly weapon against Jonathan Peters, his younger brother and friend of Dimitri.[2] The charges stemmed from events occurring early, before dawn, on August 13, 2018. A first trial ended in a mistrial. This appeal stems from a jury trial held October 20–31, 2023. Peters asserted a justification theory based on self-defense, primarily through his cross-examination of the State's several witnesses. We briefly summarize the evidence presented and the procedural context of the trial.

### (1) The State's evidence

#### (a) Jonathan Peters's testimony

Jonathan Peters testified that he and his older brother, Peters, lived in a family home in El Paso with their mother, grandmother, and sister. The brothers were both in their early twenties, close in age, about a year and a half apart. On Saturday, August 12, 2018, the day before the events at issue, their mother, sister, and grandmother were all out of town or away from the residence. Jonathan made plans to socialize with his friend, Dimitri, after work. Jonathan worked at Top Golf while Dimitri worked at Carino's, an Italian restaurant. Jonathan gave Dimitri a ride to work and picked him up at 10 p.m. when his shift ended and the restaurant closed. The two initially played video games at a friend's apartment, then they spent time afterwards at a neighborhood bar. At or near the bar's 2 a.m. closing, Jonathan invited Dimitri to stay overnight at his house. On arrival, the house was empty.

---

[2] Given the familial relationship with Peters, we refer to Jonathan by his first name. For clarity and consistency, we also refer to Dimitri by his first name.

Before they settled in for the night, Jonathan received a call from a female friend asking him for a ride home. After agreeing to help, Jonathon told Dimitri, "Hey, I'll be right back . . . if you need anything . . . just call me." Soon after, Dimitri called Jonathan telling him his brother had arrived and ordered him to "go to [Jonathan's] room or get out." Jonathan assured him he would return soon. When Jonathan returned to the house, he found Peters in the living room with a friend he did not know. Jonathan described that Peters looked "just kind of spaced out," and his friend was asleep on a couch where Dimitri had earlier been sleeping. When Jonathan said hello, he received no response. He decided he would then check in with Dimitri. Jonathan found him in his bedroom, doing well, nearly asleep on a mattress he had earlier pulled out for him to use.

Jonathan then returned to the living room to say goodnight to Peters. After apologizing for having invited a friend overnight, Jonathan asked Peters to pick up trash scattered in the living room. Peters responded by saying, "I don't want your friend here. I don't want you here." Peters next pushed Jonathan, ordering him to "get out." Jonathan responded by telling Peters he was taking the TV to his bedroom because it belonged to him. A physical altercation then erupted between the two brothers.

Peters punched Jonathan in the eye causing him to fall backwards. He then jumped on top of Jonathan while Jonathan tried to stop him. Jonathan described that Peters hit him and "gnawed" on his thumb. To get his attention, Jonathan threw Peters's PlayStation on the floor. Peters then maced Jonathan, irritating his eyes. As Jonathan screamed and wiped the irritant from his face, he saw that Dimitri had entered the room and he and Peters were fighting. Jonathan testified that Peters punched Dimitri, while Dimitri defended himself. He confirmed that Peters threw the first punch, and stated that he did not see Dimitri doing anything that would indicate he was going to kill Peters. Jonathan testified that Peters pulled out a gun and shot Dimitri twice. As Jonathan

screamed and yelled, Peters turned and approached him. He fired another shot, hitting Jonathan in his abdomen. Jonathan then stumbled to the kitchen to wash his wound. He next took a cup of water to Dimitri, who remained on the floor. Jonathan described to the jury that Dimitri died in his arms.

Jonathan underwent abdominal surgery. He described that he also sustained other smaller injuries, including bruises and bite marks on his hand and bruises on his cheek, forehead, and ear. He could not recall or explain how he sustained bruises on his hand.

### (b) The 911 call

Minutes after the shooting, Peters called 911. After providing his location, he asked the operator to hurry and send an ambulance. He reported: "I incapacitated my brother." Giving some details, he said, "they were fighting me," "they assaulted me," and "busted" my lip. Peters next said he "retreated," and he then went to his room and got his gun. The operator asked him whether "they" had any weapons. He confirmed they did not. As the call continued, Peters said, "I shot both of them," and they were both "incapacitated." He added: "I shot my brother's friend twice. I shot my brother once or maybe I got it mixed up." Peters further described: "Okay this happened because I maced one of them. I first tried to incapacitate with mace. And then it just continued, so I went to get my gun." Peters told the operator that his brother came home and started "to yell at [him]." Continuing, he said: "I maced him first, and then his friend started attacking me," adding that it all happened so fast. Describing his own condition, he said he was "kinda busted up" but he did not need immediate medical attention. The call ended as officers arrived on scene.

### (c) The police investigation

Two officers of the El Paso Police Department (EPPD) responded to Peters's call. Officers Kenneth High and Bradley Stelton found Peters standing outside the house talking on a cell phone. High issued commands and Peters complied. After handcuffing Peters, High removed a gun and a

4

canister of mace from Peters's pant pockets. At that point, the officers saw an individual (later identified as Babak Tavakoli) walk out the front door of the house. High ordered him to join Peters sitting on the driveway. High overheard Peters telling Tavakoli that he shot his gun "for being in fear of his life." Meanwhile, as Stelton approached the house, Jonathan emerged while talking on a phone. To Stelton, it appeared as if he had been shot in his chest. Near the front door of the home, Stelton found Dimitri lying on the floor. He could find no sign of life. As he entered the home's interior, he described that he saw a mess in the living room with "broken stuff all over the place[.]"

Crime scene officers soon arrived and collected evidence from the residence. Among them, Officers Ludovico Granillo and Ruben Villareal examined and worked the scene. They located blood stains, including a bloody handprint on the floor in the foyer area; they found one casing on the floor in the hallway and two casings on the floor in a "joining" room located between the living room and dining room; they found a half-full box of unfired ammunition in Peters's bedroom, which matched the casings found in the house; and they recovered a gray shirt with suspected blood near the kitchen sink. There were two projectiles found in the house: one lodged in the wall outside the bedroom and one inside a bedroom wall. Officers also found a lockbox containing a loaded handgun magazine in Peters's bedroom.

The State also presented expert witness testimony. The medical examiner opined that his autopsy revealed that Dimitri had died of a gunshot wound to his torso. A bullet entered the upper-left side of his back near his shoulder, then it traveled to the right and downwards, penetrating his left lung and heart, before stopping under his skin inches above his navel. A ballistics analyst testified that testing confirmed the gun found on Peters had fired three bullets, all recovered from the scene, with one bullet hitting Jonathan and another hitting Dimitri. Villareal testified he diagrammed the scene using a system that takes 360-degree, interactive photographs. He also

testified as a shooting reconstructionist. A blood spatter expert testified that a pool of blood near Dimitri's body indicated he received the injury and collapsed near where officers found his body.

On cross-examination, defense counsel asked the crime scene analysts about theories and other "possibilities" that could be drawn from the crime-scene evidence relevant to likely events prior to the shooting. Due to the estimated distance between the gun and Dimitri's body when hit by the bullet, the analyst acknowledged it was possible that Dimitri had rushed at Peters, and that Peters had reached over with his right hand and fired into Dimitri's left shoulder. Also, the analyst testified it was possible that Dimitri had been attempting to flee the house when Peters shot him in his back. He testified it was more likely that Dimitri had been facing the front door, bent over, at the time he was shot.

As for Jonathan, the analyst testified that Peters shot at him as he stood in the doorway of the small bedroom at the end of the hallway; that the bullet entered his stomach and exited his back; and that it then struck the wall in the small bedroom. Due to the nature of Jonathan's wound, the analyst also said it was likely that Jonathan was not standing straight up when the bullet struck his body. Because they found no gunshot residue on the hoodie Jonathan wore at the time, the analyst described it was likely that the gun had been four to seven feet from Jonathan's body when Peters fired the shot that hit him.

### (2)  The defense witnesses

The defense presented two witnesses. First, Teresa Charter, mother of the two brothers, testified she worked as a traveling nurse. She worked out of town the night of the shooting. Without specifying a time period, she testified she had instructed her children, before the shooting, that she did not allow Dimitri in her home. Without providing detail, she said she felt it was unsafe for her family for him to be in their home. Jonathan had not asked for permission to invite him over the

night in question. She also described that Jonathan had previously lost his temper and been violent with her and other members of the family on more than one occasion.

Second, Villareal was recalled and gave additional testimony identifying a DVD as a fair and accurate depiction of a crime scene walkthrough he reviewed in making his three-dimensional diagram. As the video played for the jury, Villareal responded to questions about what it depicted. After Villareal completed his testimony, the defense closed its case.

### B. The procedural history

After deliberating, the jury returned verdicts finding Peters guilty of murder and aggravated assault of a family member with a deadly weapon. After a punishment hearing, the jury recommended a sentence of 30 years' confinement and a fine of $10,000 for the offense of murder; and 15 years' confinement and a $10,000 fine for the aggravated assault offense. The trial court signed judgments of conviction in accordance with the jury's verdicts with the sentences running concurrently. Peters filed a motion for new trial, which he later amended. Following an evidentiary hearing, the motion was overruled by operation of law. This appeal followed.

## II. ISSUES ON APPEAL

Peters presents seven issues on appeal, which we sort into three clusters. His first four issues assert the trial court erred: first, by not excluding the State's expert witnesses after the State failed to meet its pretrial deadlines; second, by not disqualifying the District Attorney's Office; third, by not dismissing the charges based on due process violations; and fourth, by sustaining the State's objection to questions during voir dire. Next, Peters's fifth and sixth issues pertain to his claim of self-defense. He contends in his fifth issue that the trial court erred in not submitting a self-defense instruction to the jury; and, in his sixth issue, he challenges the sufficiency of the

evidence to prove he did not act in self-defense. Finally, in his seventh issue, Peters contends the trial court erred in denying his motion for new trial.

After reordering certain issues, we address each in turn. Because Peters's legal sufficiency challenge on self-defense results in the greatest relief, if sustained, we address it first. *See Lopez v. State*, 615 S.W.3d 238, 248 (Tex. App.—El Paso 2020, pet. ref'd) (citing *Benavidez v. State*, 323 S.W.3d 179, 182 (Tex. Crim. App. 2010)).

## III. SUFFICIENCY OF THE EVIDENCE

In his sixth issue, Peters contends the evidence was legally insufficient to prove he did not act in self-defense as to both charges.

### A. Applicable law and standard of review

A person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes death. Tex. Penal Code Ann. § 19.02(b)(1), (2). A person commits aggravated assault with a deadly weapon by (1) intentionally, knowingly, or recklessly (2) causing bodily injury to another (3) and using or exhibiting a deadly weapon during the commission of the assault. Tex. Penal Code Ann. § 22.01(a)(1), 22.02(a)(2). An assault against a family member is a descriptor, not a separate type of assault. *See id.* § 22.01(b)(1)–(5); Tex. Fam. Code Ann. § 71.003.

A defendant is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. *See* Tex. Penal Code Ann. § 9.31(a). Neither self-defense nor defense of others justifies conduct used in response to a verbal provocation alone. *See Id.* §§ 9.31(b)(1), 9.33(1). Moreover, these defenses do not apply if the defendant provoked the other person, unless the

8

defendant abandoned the encounter and the other person persisted in his or her use or attempted use of unlawful force against the defendant. *See Id.* §§ 9.31(b)(4), 9.33(1).

In a claim of self-defense or defense of third persons—either of which would justify a defendant's use of force against another—"the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). "The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue." *Id.* By contrast, the State's burden of persuasion does not require the production of any additional evidence; instead, it requires only that the State prove its case beyond a reasonable doubt. *Id.*

"In resolving the sufficiency of the evidence issue," the Court of Criminal Appeals instructs that we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 609. A guilty verdict by a jury is an implied rejection of a defendant's self-defense claim. *See id*. We review the legal sufficiency of the evidence to support a jury's rejection of a self-defense claim under the same *Jackson v. Virginia* standard. *Id.* at 608–09; *see also Smith v. State*, 355 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (applying *Jackson v. Virginia* standard to jury's rejection of self-defense claim). Under that standard, we must examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks*

*v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Evidence is insufficient when, considered in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *Witcher v. State*, 638 S.W.3d 707, 709–10 (Tex. Crim. App. 2022) (quoting *Jackson*, 443 U.S. at 319). In reviewing sufficiency, we do not re-evaluate the weight and credibility of the evidence and we do not substitute our own judgment for that of the jury. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). Rather, we defer to the jury's assessment of the credibility of the witnesses and the weight given to their testimony. *Brooks*, 323 S.W.3d at 899. We determine whether inferences are reasonable based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Braughton*, 569 S.W.3d at 608.

## B. Analysis

Peters contends the jury's rejection of his self-defense was not based on facts or evidence. Specifically, he first argues that Granillo and Villareal "confirmed that the only scientifically probable scenario, when looking at the evidence, was that [Peters] acted in self-defense." Second, he maintains that Jonathan's testimony—which provided the only testimony of a person present at the shooting—had been shown "to be demonstrably false." In sum, Peters argues the jury's verdict rested on something other than the evidence before it.

Viewing the record in the light most favorable to the verdict, as we must, we disagree with Peters's characterization of Officers Granillo and Villareal's testimony. Granillo testified he had 28 years of experience with EPPD, including 24 years in the crime scene unit. During his career, he received extensive training in various aspects of crime scene investigation, including photography, videography, diagramming, shooting reconstruction, homicide investigations, and

10

blood spatter analysis. Based on where he located three casings on scene, Granillo described that, even though casings tend to bounce a lot, their location does not really indicate the position of the shooter "[b]ut it definitely indicates that the firearm was discharged in that area." Granillo opined that it appeared that Dimitri was shot and collapsed in the area where his body was found. Said differently, Granillo testified that no evidence showed Peters shot Dimitri in one room and Dimitri collapsed in another. He acknowledged that "some type of an incident" led to the shooting. The officers noted the presence of a broken door in the living room and they found other damage to objects around the house.

Still, Granillo confirmed there was no way for him to know exactly what happened. He noted, "'[w]e have three bullet holes; one in the body of a person, one in the wall, and the other one in the door frame that those shots were accounted for based on what we had at the scene." When asked if he could tell if Peters had been falling backwards at the time he shot Dimitri, Granillo responded "[i]t's a possibility," but he could not say "100 percent for sure that's what happened." Similarly, when asked whether he was able to tell if Dimitri had attacked Peters, Granillo answered, "I'm not 100 percent sure." Granillo described probabilities he had considered based on his view of the scene: "That there is some type of confrontation. There is some kind of close contact obviously[.]" But when asked whether the evidence showed that Dimitri rushed at Peters, Granillo answered, "[t]hat I cannot tell you with certainty that that's exactly what happened, but that's a possibility." When asked if it was his understanding that there had been a "two-on-one fight," Granillo acknowledged he had received information that two people had been injured and one person had shot both of them. On redirect, Granillo added it was also possible, after viewing that Dimitri had been laying against the open front door, that Dimitri had been attempting to flee the house when Peters shot him in the back.

Villareal, an officer trained on diagramming a crime scene and on shooting reconstruction, also testified about the physical evidence found on scene. Specifically, he testified about the bullet holes and casings that were located throughout the house. Based on his training and experience, he opined that Jonathan stood near a door, not upright, when hit by a bullet. Because he found no gunshot residue on the hoodie Jonathan wore at the time, Villareal concluded that Peters shot Jonathan from a distance of four to seven feet. Villareal further opined that Dimitri likely faced the front door, while bent over, at the time he was shot.

By their testimony, both Granillo and Villareal acknowledged on cross-examination that they could not be certain what happened during the incident. Although they noted under defense questioning of their analysis that it remained a possibility that Dimitri had attacked Peters at the time Peters fired his gun, they also clarified the possibility arose from mere speculation about what could have happened, and not from any inferences they had reached as raised by the evidence. *See Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) ("Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented.").

The jury also heard directly from Jonathan about events leading up to the shooting. Jonathan repeatedly denied he had physically started a fight with Peters. Rather, Jonathan said Peters had physically attacked and maced him, stating: "I was blinded and started screaming at the top of my lungs . . . 'How could you do this to me? I'm your brother. I'm your blood brother. You can't do this to me.'" He then described that as he wiped his face, struggling to see clearly, he saw that Dimitri came into the room from the hallway. Jonathan testified: "And then I'm not sure. They both -- they both fought. They were fighting each other, one another. And before two blows from one another to each other, [Peters] pulled out a gun and he shot him twice." Jonathan described that, after Peters shot Dimitri, "I yelled, 'No,' one no, and then he shot me. Came with his gun, and

he shot me directly in the stomach, 90 degrees. Lifted up the arm, and he -- and he -- it was point-blank to the stomach."

Peters's 911 call reported that both Jonathan and Dimitri had attacked him. But he also said he maced his brother because he yelled at him. Peters told the operator: "Okay this happened because I maced one of them. I first tried to incapacitate with mace. And then it just continued, so I went to get my gun."

Peters contends on appeal that Jonathan's testimony was "demonstrably false." However, in applying our standard of review, we may not re-weigh the evidence or substitute our judgment for that of the factfinder. *See Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (providing that, when addressing a challenge to the sufficiency of the evidence, the standard of review requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."). Instead, "[w]e presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Braughton*, 569 S.W.3d at 608. Applying the sufficiency standard, as we must, and consistent with reasonable inferences based on the cumulative force of all the evidence found on scene, we conclude the jury could have believed Jonathan's version of events, rejected Peters's claim that Dimitri and Jonathan had attacked him, and found Peters had been the first aggressor. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (guiding us to give deference to the jury's resolution of any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the fact). Similarly resolving disputed evidence, the jury could have rejected Peters's contention that Dimitri was not lawfully in the home. Although their mother gave a stern instruction not to admit Dimitri into the home, Jonathan testified he had driven him there and invited him to stay overnight as his guest.

13

Even if the jury believed that Jonathan and Dimitri attacked Peters, as Peters described on the 911 recording, the jury could still conclude that no evidence justified Peters's use of deadly force. *See Carter v. State*, No. 08-22-00151-CR, 2023 WL 3400589, at *8 (Tex. App.—El Paso May 11, 2023, pet. ref'd) (mem. op., not designated for publication) (concluding victim's actions as "aggressive" and "raging" failed to support use of deadly force). Although the jury heard evidence of Peters's injuries, such as swelling and lacerations on his right hand; a laceration on his lip; several bruises on his right arm near his armpit; bruising and several lacerations to his right knee; and a laceration near his left ear, it also heard testimony the injuries were not consistent with those of a person who had been severely beaten. Moreover, Peters himself reported to the 911 operator that, while Jonathan and Dimitri lacked weapons, he left the living room and obtained his gun from his bedroom.

After viewing the evidence in the light most favorable to the verdict, we conclude a rational jury could have found against Peters on his claim of self-defense. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 894–95.

We overrule Peters's sixth issue.

## IV. JURY CHARGE ERROR

In his fifth issue, Peters contends the trial court committed reversible error by failing to submit a jury instruction on the statutory presumption of reasonableness, and by failing to require a unanimous verdict of the jury.

### A. Standard of review

We review complaints of jury-charge error following a two-step process. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (en banc). First, we must determine if there is jury charge error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc). If we

conclude that no error exists, our analysis quickly ends. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). But if error is found, then we analyze the error for harm. *Id.* Where, as here, charge error has been properly preserved by an objection to the omission of the instruction or a request for the instruction, we must reverse if the error is "calculated to injure the rights of [the] defendant," *see* Tex. Code Crim. Proc. Ann. art 36.19, that is, whether there was "some harm." *Almanza*, 686 S.W.2d at 171.

### B. Peters's complaints of charge error

#### (1) The presumption of reasonableness in using deadly force

Peters claims the trial court erred in failing to instruct the jury on the presumption of reasonableness of deadly force in the self-defense paragraphs of the jury charge, on both the murder count and the aggravated assault count, as he had requested. The State counters the instruction was unwarranted based on the state of the evidence; but if error occurred by its omission, the error was harmless.

Under the law of self-defense, a person is justified in using force against another when and to the degree that person reasonably believes the force is immediately necessary to protect him or herself against another person's use or attempted use of unlawful force. Tex. Penal Code Ann. § 9.31(a). The term "reasonable belief" means a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. *See id.* §§ 9.31(a), (b)(1) & (3); 1.07(a)(42).

Relatedly, "[a] person is justified in using deadly force against another: (1) if the actor would be justified in using force against the other under Section 9.31; and (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary":

(A) to protect the actor against the other's use or attempted use of unlawful deadly force; or

15

(B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

Tex. Penal Code Ann. § 9.32(a). "The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision is presumed to be reasonable if the actor":

(1) knew or had reason to believe that the person against whom the deadly force was used:

(A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;

(B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or

(C) was committing or attempting to commit an offense described by Subsection (a)(2)(B);

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

Tex. Penal Code Ann. § 9.32(b)(1)–(3).

"The Penal Code requires that a presumption that favors the defendant be submitted to the jury 'if there is sufficient evidence of the facts that give rise to the presumption . . . unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact.'" *See Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011) (quoting Tex. Penal Code Ann. § 2.05(b)(1)). "[W]hen reviewing a trial court's decision to deny a requested defensive instruction, . . . we view the evidence in the light most favorable to the defendant's requested submission." *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

In support of the statutory presumption-of-reasonableness instruction, Peters asserts the record includes more than a scintilla of evidence that Peters had a reason to believe that Dimitri

16

and Jonathan were trying to kill him. First, as to Dimitri's presence inside the family's occupied habitation, Peters argues his mother testified she had given instructions to Jonathan and Peters for them not to let Dimitri into their home. Second, as for his reasonable belief that the deadly force was immediately necessary, he asserts the evidence suggested there had been a precipitating fight between him, Jonathan, and Dimitri, and the fight led to a struggle over the gun. Specifically, he points to officers Granillo and Villareal agreeing it was possible to infer from the physical evidence they observed on scene that Dimitri had rushed at and physically attacked Peters, leading to a struggle over the gun, which Peters feared could be turned against him. Third, Peters points to the 911 call he made immediately after the shooting wherein he reported "they were fighting me," "they assaulted me," and they "busted" my lip. Fourth, he also contends an officer who responded to the 911 call testified that, while Peters and Tavakoli were sitting on the curb outside the home, he overheard Peters say he had fired his gun "for being in fear of his life." In sum, he maintains the evidence supports each of the three prongs under § 9.32b(b), and, thus, the trial court erred by omitting a presumption-of-reasonableness instruction.

When the cited evidence is viewed in the light most favorable to Peters, we hold there was some evidence suggesting Peters feared for his life, some evidence he did not provoke the fight (although contested), and no evidence clearly establishing that Peters otherwise engaged in criminal activity. *See* Tex. Penal Code Ann. § 9.32(b). Because there was some evidence to support Peters's requested presumption-of-reasonableness instruction pursuant to § 9.32(b), we thus conclude the trial court erred by failing to instruct the jury with regard to the presumption-of-reasonableness instruction. *See Almanza*, 686 S.W.2d at 171; *Gonzalez v. State*, No. 13-23-00025-CR, 2024 WL 2349321, at *6 (Tex. App.—Corpus Christi May 23, 2024, no pet.) (mem. op., not designated for publication) (finding elements met and defendant was entitled to the presumption-

of-reasonableness instruction when some evidence, when viewed in the light most favorable to the defendant, suggested he feared for his life, there was no evidence he provoked the complainant, or the evidence was conflicted, and the evidence did not clearly establish defendant was engaged in criminal activity).

But following the *Almanza* two-step process on review, we can only reverse the trial court's judgment based on erroneous omission of a requested instruction if there is "some harm." *Almanza*, 686 S.W.2d at 171. This standard requires us to find that the defendant "suffered some actual, rather than merely theoretical, harm from the error." *Warner v. State*, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008). In evaluating whether there was some harm, we consider: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

### (a) The jury charge as a whole

The charge given in this case properly instructed the jury that Peters was justified in using self-defense if he reasonably believed that deadly force was immediately necessary to protect himself against Dimitri's or Jonathan's attempted use of unlawful deadly force. However, because no other portion of the instructions alerted the jury to *presume* that Peters had a reasonable belief that the use of deadly force was necessary, this factor would weigh in favor of harm. *See Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (agreeing with lower appellate court's conclusion that jury charge weighed in favor of egregious harm because "[n]othing in the charge alerted the jury that it must presume [appellant] had a reasonable belief that the use of deadly force was necessary"). Still, had the jury been provided the "presumption-of-reasonableness" instruction, the jury would nevertheless have been able to resolve conflicts in the evidence and conclude that the presumption was inapplicable given Jonathan's testimony identifying Peters as the initial aggressor, Jonathan's further testimony describing that Dimitri did not attack Peters, and

18

the evidence from the medical examiner's testimony that Dimitri was shot in the back and immediately fell to the floor near the front door of the home where his body was found by responding officers. For this reason, even if this factor weighs in favor of harm, the weight is minimal. *See id.* (affording incomplete charge less weight because complete charge "would have also permitted the jury to conclude that the presumption was inapplicable based on the facts of this case").

### (b) The arguments of counsel

Next, looking at the arguments of counsel, both sides focused on the applicability of the self-defense claim and the reasonableness of Peters's belief regarding his use of deadly force. But, Peters's belief in the reasonableness of his use of deadly force was not the sole focus of the arguments. Counsel also focused more broadly on the sequence of events leading up to the shooting, the credibility of Jonathan's testimony, the reliability of the shooting-reconstruction evidence, and Peters's actions after the shooting. Because the issue of Peters's belief in the reasonableness of his use of deadly force was not the sole focus of the parties' arguments, this factor weighs against a finding of actual harm. *See Villarreal*, 453 S.W.3d at 441–42 (holding that counsels' arguments did not weigh in favor of finding of harm because they did not center on reasonableness of defendant's belief that use of deadly force was immediately necessary).

### (c) The entirety of the evidence and other relevant factors

Finally, considering the entirety of the evidence and record, a rational jury could have determined that unprovoked, Peters had shot Dimitri and Jonathan, and they both were unarmed. As previously discussed, although Granillo and Villareal conceded that other theories about what led to the shooting could possibly be inferred from the evidence collected on scene, no evidence was presented at trial that Dimitri had used deadly force against Peters. Officers described at trial that Peters had minimal injuries when they arrived on scene. Indeed, when the 911 operator asked

him about injuries, he merely said he had a "busted" lip. He reported that after "they were fighting [him]" and "assaulted [him]," he "retreated" from them, and went to his room to get his gun. When the operator asked Peters whether "they" had any weapons, he confirmed they did not without providing any further detail. As the sole judge of the credibility of the witnesses, even if the jury had received the requested instruction on the presumption of reasonableness, the instruction would have permitted the jury to disregard the presumption based on a determination that Jonathan had invited Dimitri into the home as his overnight guest and Peters verbally and physically provoked a fight, during which he used mace on Jonathan, then left the room only to return with a gun and fire shots at both of them. These factors all weigh against finding some harm.

After considering the relevant factors, we conclude that Peters did not suffer any actual harm as a result of the error. *See Almanza*, 686 S.W.2d at 171; *Haye v. State*, No. 01-15-01057-CR, 2017 WL 444462, at *6 (Tex. App.—Houston [1st Dist.] Feb. 2, 2017, pet. ref'd) (mem. op., not designated for publication) (concluding, after considering all relevant factors, appellant did not suffer any actual, as opposed to theoretical, harm as a result of error stemming from the jury charge not including the presumption-of-reasonableness instruction); *Schule v. State*, No. 05-13-01200-CR, 2015 WL 1859040, at *16 (Tex. App.—Dallas Apr. 22, 2015, no pet.) (not designated for publication) (finding appellant failed to show he suffered some actual, rather than theoretical, harm from the trial court's failure to include a complete presumption-of-reasonableness instruction in the jury charge).

We overrule Peters's first ground of his fifth issue.

### (2) Unanimity

Peters also asserts the jury charge erroneously allowed the jury to consider multiple methods of committing murder and it wrongly instructed the jury they need not agree on which method they believed. We disagree.

Under the federal and state constitutions, "[a] jury must reach a unanimous verdict in order to convict." *Ramos v. Louisiana*, 590 U.S. 83, 90 (2020); *see* Tex. Const. art. V, § 13; *see also* Tex. Code. Crim. Proc. Ann. art. 36.29(a); *Ngo*, 175 S.W.3d at 745. "The jury must agree that the defendant committed one specific crime, but this does not mean that the jury must unanimously find that the defendant committed that crime in one specific way or even with one specific act." *O'Brien v. State*, 544 S.W.3d 376, 382 (Tex. Crim. App. 2018). "[T]he requirement of jury unanimity is not violated by a jury charge that presents the jury with the option of choosing among various alternative manner and means of committing the same statutorily defined offense." *Id.*

Here, Peters concedes that Texas case law has repeatedly held that such jury charges are proper. *See Saenz v. State*, 451 S.W.3d 388, 390 (Tex. Crim. App. 2014) ("The unanimity requirement is not violated by instructing the jury on alternate theories of committing the same offense"). However, he then contends that decisions by the Court of Criminal Appeals conflict with the United States Supreme Court's holding that "the Sixth Amendment requires unanimity." *See Ramos*, 590 U.S. at 92. He then asks this Court "to overrule prior precedent to conform with United States Supreme Court caselaw." We decline to do so.

Following the two-step process, we first determine whether the charge contained error by permitting a nonunanimous verdict as Peters claims. *See Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011); *Ngo*, 175 S.W.3d at 744. The trial court's charge in this instance instructed the jury, as to Count I:

Now if you unanimously find from the evidence beyond a reasonable doubt that on or about the 13th day of August, 2018, in El Paso County, Texas [Peters], did then and there intentionally or knowingly cause the death of [Dimitri] by shooting him with a firearm or intended to cause serious bodily injury to [Dimitri] and committed an act clearly dangerous to human life, to wit: shooting [Dimitri] with a firearm that caused the death of [Dimitri] and [Peters] used or exhibited a deadly weapon, to wit: a firearm, during the commission of or immediate flight from said offense, then next you will consider from the evidence the issue of self-defense.

Then, as to Count II:

Now if you unanimously find from the evidence beyond a reasonable doubt that on or about the 13th day of August, 2018, in El Paso County, Texas, [Peters] did then and there intentionally, knowingly or recklessly cause serious bodily injury to Jonathan Peters by shooting Jonathan Peters, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm, during the commission of said assault, and the said Jonathan Peters was a member of the defendant's family or household as descried by Section 71.003 and 71.005, Family Code, then next you will consider from the evidence the issue of self-defense.

Under both counts, the trial court instructed the jury:

To decide the issue of self-defense, you must determine whether the State has proved, beyond a reasonable doubt, one of the following two elements. The elements are that—

1.  the defendant did not believe his use of force was immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force; or

2.  the defendant's belief was not reasonable.

You must all agree that the State has proved, beyond a reasonable doubt, element 1 or 2 listed above. You need not agree on which of these elements the state has proved.

Peters does not make clear what portion of the charge he is challenging. Still, we conclude there is no error in the charge. As to Dimitri, regardless of whether the jury determined that Peters intentionally or knowingly caused Dimitri's death, or that he caused Dimitri's death by committing an act clearly dangerous to human life with the intent to cause serious bodily injury, there was only a single crime: to wit, murder. *See Walter v. State*, 581 S.W.3d 957, 968 (Tex. App.—Eastland

2019, pet. ref'd). Further, as to the self-defense instruction, it was unnecessary for the jury to agree on which of the two elements the State had proved if they all agreed the evidence established at least one element had been proven by the evidence. The trial court's charge in this instance properly required a unanimous verdict as to the crimes charged. *See O'Brien*, 544 S.W.3d at 382. We decline Peters's invitation to depart from precedent from the Texas Court of Criminal Appeals. *See Walter*, 581 S.W.3d at 968.

We overrule the remaining part of Peters's fifth issue.

## V. VARIOUS TRIAL ISSUES

Peters presents four issues challenging trial court rulings made before and during trial. We address each in turn.

### A. Expert witness disclosures

In his first issue, Peters argues the trial court erred by *not* excluding all of the State's expert witnesses after the State repeatedly failed to meet pretrial deadlines imposed by the trial court's orders.

#### (1) Relevant factual background

On March 20, 2020, the State gave written notice of its prospective expert witnesses and included Granillo and Villareal among its other witnesses. The State then supplemented its witness list on October 31, 2022, and again included Granillo and Villareal. That same day, Peters filed a motion to prohibit testimony from the State's experts, arguing the State's failure to disclose expert-related information warranted their exclusion. At a judge's conference, the trial court ordered the State to disclose the requested information to Peters, cautioning that it would "start considering striking witnesses and excluding evidence" if the State failed to comply. The State then filed a final expert-witness list including Dr. Mario Rascon (El Paso County Medical Examiner), Cathey

Serrano (DNA Expert), and Tim Counce (Forensic Scientist-Firearms and Toolmarks), among others. Peters filed a second motion to strike asserting the State had failed to provide curriculum vitaes of its experts, failed to disclose their prior instances of trial testimony, and their anticipated areas of testimony. Although the trial court denied the motion, it nonetheless ordered the State to file a final expert witness list before midnight on November 1, 2022.

The case was set for trial on August 4, 2023. Prior to voir dire, Peters moved to dismiss the case based on prosecutorial misconduct. In addition to that motion, the trial court considered Peters's motion to strike all the State's witnesses. Notably, however, Peters excluded two expert witnesses from his motion to strike "because the information that was provided at the 13th hour was exculpatory." Peters argued the only remedy he could ask for was to strike *all* the witnesses save the two experts. The trial court asked whether Peters had received all the information he wanted on experts, to which he replied that he "assume[d]" he did. The trial court offered that it could grant the motion to exclude all experts because the State had failed to comply, but Peters asked instead that the court strike *all* witnesses. The trial court denied that request. The court then proceeded to voir dire, but before the session concluded, the trial court declared a mistrial. A new trial, which is the basis of this appeal, began on October 20, 2023. Between the mistrial and the start of the second trial, Peters did not object again to the State's disclosure of its expert witnesses.

**(2) Applicable law and standard of review**

Article 39.14 of the Code of Criminal Procedure contains provisions relating to the State's duty to provide discovery to criminal defendants. *See* Tex. Code. Crim. Proc. Ann. art. 39.14. The statute requires the State to produce discovery "as soon as practicable after receiving a timely request from the defendant." *Id.* art. 39.14(a). In addition, even in the absence of a request by the defendant, the State has a "free-standing duty" to disclose all exculpatory, impeaching, and

24

mitigating evidence in its possession, custody, or control that tends to negate guilt or reduce punishment for the offense charged. *Id.* art. 39.14(h); *State v. Heath*, 696 S.W.3d 677, 695 (Tex. Crim. App. 2024). This duty extends to information or items held in the custody of law enforcement. *Heath*, 696 S.W.3d at 693.

Article 39.14 does not provide a remedy for a discovery violation. However, the trial court *may* exclude untimely evidence. *See Heath*, 696 S.W.3d at 707–08. Alternatively, the court may grant a continuance or temporarily postpone trial. *Id.* The question on appeal is whether "the trial court was within its discretion to fashion a remedy it deemed appropriate." *Id.* at 708; *State v. Rooney*, No. 08-25-00152-CR, 2025 WL 3300441, at *3 (Tex. App.—El Paso Nov. 26, 2025, pet. filed) (mem. op., not designated for publication) (emphasizing that exclusion of evidence and lesser remedies all fall within a trial court's discretion when addressing willful violations of Article 39.14's requirements). A trial court abuses its discretion if its decision lies outside of the zone of reasonable disagreement, and an appellate court may not substitute its own decision for that of the trial court. *Heath*, 696 S.W.3d at 688–89.

### (3) Analysis

On November 6, 2019, Peters served a 12-page letter on the State formally requesting disclosure of evidence under Article 39.14 of the Code of Criminal Procedure, and the principles of *Brady v. Maryland*, 373 U.S. 83 (1963). Relevant to expert witnesses, Peters asked for disclosure of experts area of expertise, lists of their testimony history, and all reports of scientific tests, experiments, and analysis.

Before declaring a mistrial, Peters argued his motion to disqualify "all of the State's expert witnesses." Peters, however, did not object again before or during the second trial. For this reason, the State contends he abandoned any discovery-related challenges, and waived this complaint. *See*

*Stairhime v. State*, 463 S.W.3d 902, 906 (Tex. Crim. App. 2015) (stating that, when assessing whether a statement of "no objection" waives a previously preserved error, courts ask whether "the record as a whole plainly demonstrates that the defendant did not intend, nor did the trial court construe, [defendant's] 'no objection' statement to constitute an abandonment of a claim of error . . . earlier preserved for appeal" and that if "it remains ambiguous whether waiver was intended, the court should resolve the ambiguity in favor of a finding of waiver").

Even if we assume without deciding that Peters preserved his disclosure complaint for review, we still conclude the trial court did not err in not excluding the State's expert witnesses during the second trial. Here, Peters relies on *Heath*, a recent decision from the Court of Criminal Appeals, affirming the Waco Court of Appeals' judgment suppressing an untimely disclosed recording of a 911 call. *See Heath*, 696 S.W.3d at 709 (holding that Article 39.14, imposed a duty upon the State to disclose discoverable evidence "as soon as practicable," meaning as soon as the State is reasonably capable of doing so, upon receiving a timely request from the defense). Peters argues the State's conduct in the instant case was more egregious than in *Heath.*

But the procedural posture in *Heath* differs from the instant case. Unlike *Heath*, the trial court here did not exclude evidence. After the trial court declared a mistrial, which was due to a tainted jury panel, there was a two-month postponement of the case. When the new trial began, Peters neither objected nor asked for more time to prepare based on a late disclosure of information relevant to the State's witnesses. *See Rodriguez v. State*, 630 S.W.3d 522, 524 (Tex. App.—Waco 2021, no pet.) (holding defendant waived complaint of Article 39.14(a) violation by failing to request continuance when State disclosed a document on the first day of trial); *Prince v. State*, 499 S.W.3d 116, 121 (Tex. App.—San Antonio 2016, no pet.) ("By failing to file a sworn, written motion for continuance, Prince failed to preserve error on . . . any alleged discovery violation.").

By neither objecting nor seeking extra time, Peters waived a purported violation of the State's Article 39.14 obligation. Because the question before us is whether the trial court abused its discretion in fashioning the remedy it did based on the State's delayed disclosure of requested information, we conclude it could have reasonably decided that Peters had ample time to review the evidence and prepare for the subsequent, scheduled trial. *Heath*, 696 S.W.3d at 708; *Rooney*, 2025 WL 3300441, at *3.

We overrule Peters's first issue.

## B. Prosecutorial misconduct

Combining issues two and three, Peters contends the trial court erred in not disqualifying the entire District Attorney's Office from prosecuting the case; and it further erred in not dismissing charges against him for due process violations.

Similar to Peters's first issue, the background facts relevant to these issues pertain to events occurring prior to August 4, 2023, or before his first trial ended in a mistrial. During a pretrial conference before the first trial, the two assistant district attorneys prosecuting the case—Shantal Ortega and Samantha Nelson—notified the trial court and Peters of their recent receipt of *Brady*[3] information when they were "pre-trialing" a witness "that was inside the [Peters] house." Upon receipt, Peters moved for a continuance. Although the trial court denied his motion, it did order the State to provide Peters with formal, written notice by end of the day. Peters added that he wanted the State to identify all persons who were present at the time of the State's witness interview. Ortega replied that only she and Nelson were present at the time. Peters then asserted that Nelson and Ortega had now become fact witnesses in the case. On that basis, he verbally moved to disqualify them from trying the case. Although the trial court denied his motion, it

---

[3] *See Brady v. Maryland*, 373 U.S. 83 (1963).

advised the parties that a hearing would be set if Peters filed a written motion to disqualify. Peters did so, and the trial court heard testimony from both Ortega and Nelson. Nelson testified she no longer worked on the case as she had been reassigned after Peters filed his motion to disqualify. Peters argued the State had violated Rule 3.08 of the Texas Disciplinary Rules of Professional Conduct. *See* Tex. Disciplinary Rules Prof'l Conduct Rule 3.08 (governing "Lawyer as Witness"). He argued the two prosecutors had continued to discuss the case with other attorneys in the office. The trial court asked Peters to clarify whether he was asking for a disqualification of the entire district attorney's office, and counsel replied, "Do I think that would stand up on appeal? Probably not." When asked what remedy he sought, counsel replied that he sought disqualification of Ortega and Nelson, "at the very least." He further argued the trial court could disqualify every prosecutor who they named as having discussed the circumstances of the witness's statement with them. The trial court took the matter under advisement.

With trial set on August 4, 2023, the trial court held a final judge's conference, on July 11. The trial court noted it still owed an order on Peters's motion to disqualify, and it asked for proposed orders. Next, Peters and the State both announced they were ready for trial. The State informed the trial court that detectives were taking the statement of witness Jonathan David Gonzalez, who the State intended to call for trial. Gonzalez was not the witness who was the subject of the motion to disqualify. Gonzalez was a friend of Peters who would testify on comments made by Peters. The State indicated Gonzalez was "related to one of the ADAs in the office" and once the case was set for trial, the witness said "this is my . . . friend that had said all these things." The State explained that Peters was out on bond "[s]o anytime [Peters] speaks to anybody about the incident, they may come forward, and that's what happened in this case." Peters responded: "Or somebody's just continually trying to find witnesses to lie for their benefit, one or the other."

The trial court instructed the State to send Gonzalez's anticipated statement to defense as soon as it was received.

On July 20, 2023, the trial court held another pretrial hearing on Peters's motion for disqualification and other matters related to the disclosure of trial witnesses.[4] Two newly assigned prosecutors appeared on behalf of the State. The trial court reported that it "was in the process of drafting final findings of fact and conclusions of law," and it had planned on granting Peters's disqualification motion. However, the trial court remarked the motion appeared to be moot since even Ortega no longer remained assigned to the case, and it had no plan to disqualify the entire office of prosecutors. The trial court did not sign a written order on the motion to disqualify. As for the new witness disclosed, the State explained he was a friend of Peters and a cousin to "a guy in our office."

Peters then filed a formal, written request for the State to comply with Article 39.14, including disclosure of any relationship between alleged witness Gonzalez and any member of the District Attorney's office. Weeks later, he moved to dismiss for prosecutorial misconduct, alleging he had since learned that Gonzalez was a cousin of an assistant district attorney and they lived together. The motion urged that "[Gonzalez] was placed by the District Attorney's Office into the life of Mr. Peters with an aim to garner information from [Peters] in violation of his Sixth Amendment right to counsel, his Fifth Amendment right to remain silent, and his due process right to a fair trial."

The trial court held a two-day hearing on Peters's motion. Assistant District Attorney Bryan Rodriguez testified that, although he had previously been assigned to the trial court presiding over Peters's case, he was transferred to a different court a month prior to the hearing. He confirmed

---

[4] At the same hearing, the trial court heard argument about the State's disclosure of witnesses as discussed under our review of Peters's first issue.

that he and Gonzalez are cousins and they lived together for a time, but not any longer. Rodriguez stated that Gonzalez informed him that "his buddy Nick" was on trial for murder, but he did not know who Nick was at that time. Gonzalez had told him that Peters was always carrying a weapon; he made statements that he was the only one who knew how to use it; he asked Gonzalez whether he was man enough to pull the trigger; and he said he wanted to know what it felt like to kill somebody. Rodriguez stated it was not until the motion to disqualify hearing—which he was present for—that Rodriguez matched some facts to what Gonzalez told him and understood what he meant by his "buddy Nick." He reported his discovery to supervisors in the office and asked Gonzalez if he would speak to someone in his office.[5] Rodriguez stated that he was never assigned to the case, that he did not work on details of the case, and that he did not view the files of the case. Rodriguez testified that he had been in the courtroom to handle other cases when the disqualification hearing took place. He further testified that he never told Gonzalez to become friends with Peters or to talk to him regarding his case. He also confirmed that no one from the District Attorney's office asked him to do either of those things.

Peters argued the State deliberately placed Gonzalez into Peters's life to acquire information about the case after the right to counsel had attached, violating his Sixth Amendment right to counsel. The trial court denied Peters's dismissal motion. We address each issue in turn.

### (1) Motion to disqualify

The standard of review for disqualification of the prosecutor by the trial court is whether the court abused its discretion. *Landers v. State*, 256 S.W.3d 295, 303 (Tex. Crim. App. 2008). The trial court abuses its discretion only when the decision lies outside the zone of reasonable disagreement. *Id.*; *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). In reviewing

---

[5] Gonzalez never spoke to anyone in the District Attorney's office, did not respond to Peters's subpoenas, and never testified at trial.

the historical facts upon which the trial court's ruling on a motion to disqualify is based, an appellate court should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Landers*, 256 S.W.3d at 303. When the defendant contends that the lower court erred in applying the law to the trial court's findings, the review is de novo. *Id.*

Because the trial court granted Peters the relief requested when it disqualified two prosecutors, the State argues he failed to preserve any error. Peters responds that he sought to disqualify all members of the District Attorney's office, and that he brought that broader request to the trial court's attention.

Even if we assume Peters preserved error, we conclude he failed to show the trial court erred in not disqualifying the entire office. Peters argues that the District Attorney's Office failed to isolate Nelson and Ortega. He asserts that Ortega and Nelson continued to discuss the case with supervisors after the "potential disqualification was raised." In support of his argument, Peters cites cases that held an entire district attorney's office need not be disqualified when the lawyers with the confidential information were isolated as to not impute the information to the entire office. *See State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 3, 6 (Tex. Crim. App. 1990) (en banc) (holding the trial court erred in entering an order disqualifying the Taylor County Criminal District Attorney (and his entire staff) when it disqualified one prosecutor who had previously represented a defendant in the same criminal matter); *Harris v. State*, No. AP-76,810, 2014 WL 2155395, at *17 (Tex. Crim. App. May 21, 2014) (not designated for publication) (holding the trial court did not

err in denying appellant's motion to disqualify an entire District Attorney's office when appellant's former, second-chair counsel was hired by the office).[6]

Peters's cited cases are distinguishable. They both involved an appellant's former counsel who had previously worked for the prosecutors' office. Peters does not cite any authority, and we find none, in which a court excluded an entire prosecutor's office based on facts similar to this case. *See* Tex. R. App. P. 38.1(i). Accordingly, Peters fails to show the trial court abused its discretion by denying his motion to disqualify all members of the District Attorney's office.

We overrule his second issue.

### (2) Due process violation

In his third issue, Peters contends the trial court erred in not dismissing the charges against him based on due process violations.

In *Massiah v. United States*, 377 U.S. 201, 206 (1964), the United States Supreme Court held that the Sixth Amendment prohibits the government from using a defendant's "own incriminating words" against him in a criminal proceeding if the government or one of its agents "deliberately elicited" the incriminating statement without the defendant's counsel being present. The Court of Criminal Appeals has described the *Massiah* inquiry as being "whether, after the Sixth Amendment right to counsel has attached, the government . . . knowingly circumvented the defendant's right to counsel by using an undisclosed government agent to deliberately elicit

---

[6] Peters cites these cases for their mention of the phrase "Chinese Wall." The phrase "Chinese Wall" is used as a term of defense to law-firm disqualification:

> [L]aw firms faced with the possibility of disqualification have attempted to rebut the presumption of imputed knowledge by adopting procedures designed to create an impermeable barrier to intrafirm exchange of confidential information. Called "screens" or "Chinese walls," these procedures aim to isolate the disqualification to the lawyer or lawyers infected with the privileged information that is the source of the ethical problem, and thereby to allow other attorneys in the firm to carry on the questioned representation free of any taint of misuse of confidences.

*The Chinese Wall Defense to Law-Firm Disqualification*, 128 U. PA. L. REV. 677, 678 (1980). Peters asserts that a "Chinese Wall" was not erected around Nelson and Ortega. For the reasons already stated, we reject Peters's argument.

incriminating information." *Rubalcado v. State*, 424 S.W.3d 560, 570 (Tex. Crim. App. 2014). *Massiah* thus applies "only if the person who elicited statements from the defendant was a government agent." *Id.* at 575.

The Court of Criminal Appeals has discerned "at least one common principle: to qualify as a government agent, the informant must at least have some sort of agreement with, or act under instructions from, a government official." *Manns v. State*, 122 S.W.3d 171, 183–84 (Tex. Crim. App. 2003). "The agreement or instruction need not necessarily involve a quid pro quo; it may be enough for the State to make a 'conscious decision to obtain the informant's cooperation' and for the informant to 'consciously decide[] to provide that cooperation.'" *See Hall v. State*, 663 S.W.3d 15, 29 (Tex. Crim. App. 2021) (quoting *Rubalcado*, 424 S.W.3d at 575–76). However, if there is no agreement or an instruction from the government for the informant to obtain incriminating information, there is no agency relationship for *Massiah* purposes. *Id.*

In reviewing a trial court's resolution of an issue of this nature, an appellate court should afford "almost total deference" to the trial court's determination of historical facts and mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Manns*, 122 S.W.3d at 178.

Peters argues the record in the instant case meets *Massiah's* standard. Peters acknowledges that there was no evidence that Gonzalez was acting as a paid informant for the District Attorney's office. However, he maintains that Gonzalez received a favorable plea offer in his own criminal case "during the same time frame" that he became friends with Peters. He further urges that Gonzalez lived with a prosecutor "who could possibly assist in the trial of the case." Peters contends there is no coincidence that Gonzalez entered into Peters's life just prior to trial, and

therefore, when combined with other transgressions by the District Attorney's office, his case should have been dismissed. Applying the appropriate standard of review, we disagree.

In support of his complaint, Peters points to social media messages to show that Gonzalez and Peters became social media friends months before the trial. However, even if the messages confirm their social media friendship, the evidence is not indicative of the District Attorney's Office using Gonzalez as a paid informant. On the other hand, Rodriguez testified that neither he nor his office asked Gonzalez to elicit information from Peters. Also, he testified that Gonzalez never spoke with other members of the District Attorney's office.

The trial court was free to believe Rodriguez's testimony and reject Peters's characterization of the social media messages. *See Manns*, 122 S.W.3d at 178 (providing courts should afford "almost total deference" to the trial court's determination of historical facts and mixed questions of law and fact that turn on an evaluation of credibility and demeanor). Based on these facts, we conclude the record lacks evidence that Gonzalez acted as a government agent and provides no evidence of a violation of Peters's Sixth Amendment right to counsel. *Hall*, 663 S.W.3d at 30 (concluding there was no agreement between the State and a comedian filming content for a television show to gather evidence); *Fleeks v. State*, No. 01-18-00904-CR, 2020 WL 3393072, at *3 (Tex. App.—Houston [1st Dist.] June 18, 2020, no pet.) (mem. op., not designated for publication) (finding private investigator hired by co-defendant's trial counsel was not acting as an agent of the state when he obtained a written statement from appellant).

We overrule Peters's third issue.

## C. Voir dire

In his fourth issue, Peters argues the trial court abused its discretion in sustaining the State's objections to his questions during jury selection. During voir dire, while defense counsel informed

34

the panel about the applicable punishment range at issue, the following questioning took place with a venireperson.

> [DEFENSE COUNSEL]: [Venireperson 8], if you determine that [Peters] murdered somebody and you did not believe he acted in self-defense, could you consider five years in prison?
>
> VENIREPERSON []: No
>
> [DEFENSE COUNSEL]: You could not?
>
> VENIREPERSON []: If he did not act in self-defense?
>
> [DEFENSE COUNSEL]: Correct.
>
> VENIREPERSON []: No.
>
> [DEFENSE COUNSEL]: Could you consider six years in prison?
>
> VENIREPERSON []: It all depends.
>
> [DEFENSE COUNSEL]: Right. Sure. We—we don't know what's coming. But you could not consider five years in prison. Correct?
>
> VENIREPERSON []: No.
>
> [DEFENSE COUNSEL]: Is there anybody that could consider five years in prison if you found that [Peters] did not act in self-defense? Okay. [Venireperson] 9 said yes. [Venireperson] 18 said yes. Is—so then everybody else, does that mean you could not consider five years in prison?

The State asked to approach the bench. It objected that Peters was impermissibly contracting the jury. Defense counsel pointed out that he had used the phrase "consider" and he had not sought a commitment from any venireperson. The trial court sustained the State's objection and instructed the panel that "[t]he law requires the jurors that are seated in this case to be able to consider the full range of punishment." Defense counsel then asked to approach again and objected to the trial court's instruction, complaining it commented on his credibility. The trial court noted the objection, and defense counsel continued his questioning and asked Venireperson 8 whether she could

35

consider 99 years in prison, and she responded "Yes. If you put it that way, consider." She also said she could consider a five-year sentence. Defense Counsel asked whether there was anyone who could not consider a five-year sentence, and 11 venirepersons responded they could not.

Defense counsel moved to strike Venireperson 8 asserting the trial court had brought into question his credibility when it sustained the State's objection, and that the juror rehabilitated herself based on the trial court's ruling. The State opposed responding that the trial court did not strike at counsel's integrity but clarified the law. The trial court denied the motion to strike but allowed further examination of Venireperson 8. During individual voir dire, Venireperson 8 stated that she could not consider a five- year sentence if the evidence showed Peters had not acted in self-defense. The trial court granted Peters's motion to strike her for cause. Defense counsel then requested more time for voir dire, asserting the trial court had prevented him from posing a proper question. The trial court denied the request.

We review a trial court's ruling during a voir dire examination under an abuse of discretion standard. *See Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012). "A trial court should give a defendant great latitude in questioning the venire." *Sanchez Luna v. State*, No. 05-04-00494-CR, 2005 WL 428852, at *1 (Tex. App.—Dallas Feb. 24, 2005, no pet.) (not designated for publication). However, a trial court has broad discretion to impose reasonable restrictions on the voir dire process, specifically in restricting questions that are confusing, misleading, vague and broad, or amount to improper commitment questions. *See Hernandez*, 390 S.W.3d at 315; *Howard v. State*, 941 S.W.2d 102, 108 (Tex. Crim. App. 1996).

"Not all commitment questions are improper." *See Standefer v. State*, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001). "For example, questions concerning a juror's ability to consider the full range of punishment for a particular offense" are proper even though they meet the definition of

36

commitment questions. *Id.* "[P]rospective juror[s] must be able to consider the full range of punishment provided for an offense or be challengeable for cause." *Id.* (citing *Johnson v. State*, 982 S.W.2d 403, 405 (Tex. Crim. App. 1998)). When the law requires a certain type of commitment from jurors, the attorneys may ask the prospective jurors whether they can follow the law in that regard. *Id.* However, an otherwise proper commitment question may nevertheless be improper if it includes facts *in addition* to those necessary to establish a challenge for cause. *Id.*

Peters contends the trial court erred in sustaining the State's objection to his voir dire question. He contends the trial court prevented counsel from being able to determine whether venirepersons could consider the full range of punishment as required. We disagree.

Here, Peters's question sought to determine how the particular fact of self-defense might influence the jury's sentencing deliberations. Because the question contained an evidentiary fact specific to the case, it was an improper commitment question. *Standefer*, 59 S.W.3d at 181. The record shows the trial court merely sustained the State's objection as to the form of Peters's question and did not place an absolute restriction on the subject area. *See Hernandez*, 390 S.W.3d at 316. In fact, the trial court allowed defense counsel to continue questioning and even allowed defense counsel to ask the same question during individual voir dire. Moreover, the trial court struck all of those who indicated they could not consider the full range of punishment. Accordingly, there was no abuse of discretion. *Id.*

We overrule his fourth issue.

## VI. The Motion for New Trial

In his seventh and final issue, Peters contends the trial court erred in denying his motion for new trial. In addition to issues discussed above, Peters argued the State committed a *Brady* violation by failing to disclose that Jonathan had communicated that he did not want Peters to be

prosecuted or for him to receive a lengthy prison sentence. Additionally, Peters urged that Jonathan had provided a post-trial statement to a defense investigator where he changed his trial testimony and described that Dimitri threw the first punch at Peters.

### A. The evidentiary hearing

The trial court held an evidentiary hearing on the motion for new trial. Jonathan testified that, although he had been subpoenaed to testify at trial, he did not want to testify for the State. He also explained that he was not present during the punishment phase of trial because the State had not discussed Peters punishment with him. Continuing, he said he had told someone that he believed probation would have been an appropriate punishment.

Jonathan further testified that he recalled he said at trial that Dimitri never punched Peters, while Peters had attacked Dimitri. That testimony, he claimed at the hearing, was incorrect. He explained he had changed his opinion because his brain now told him he saw his brother get hit but he did not remember that detail during the trial. Still, Jonathan confirmed the incident started with their argument about the TV. He described that Peters started punching him in the head and bit his thumb. He explained he was maced and could not see clearly. He said that Dimitri threw the first and only punch. But then he stated that he saw a "few exchange of hits. And then that's when the gun was drawn." The motion for new trial was overruled by operation of law.

### B. Standard of review

We review a trial court's denial of a new trial motion for an abuse of discretion. *Najar v. State*, 618 S.W.3d 366, 371 (Tex. Crim. App. 2021). Under the deferential standard the trial judge has "the right to accept or reject any part" of a witness's testimony when ruling on a motion for new trial. *Beck v. State*, 573 S.W.2d 786, 791 (Tex. Crim. App. [Panel Op.] 1978); *Colyer v. State*, 428 S.W.3d. 117, 126 (Tex. Crim. App. 2014). We afford almost total deference to a trial court's

fact findings, view the evidence in the light most favorable to the trial court's ruling, and reverse the ruling only "if no reasonable view of the record could support" it. *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013). In the absence of express findings, we must presume all findings in favor of the prevailing party. *Id.*

### C. Analysis

On appeal, Peters argues two grounds in support of his new trial motion.

First, he asserts the State committed a *Brady* violation by not informing the defense that Jonathan had told prosecutors he did not want Peters punished. Peters contends the State exacerbated the problem by invoking Jonathan's name to seek a higher sentence during the State's closing argument. In our review of the record, the State, during its closing argument, noted that Peters's family members did not mention Jonathan or refer to him as a victim during their testimonies. The State then moved on and talked about Dimitri, how Peters's conduct cut short his life by "at least 50 years." From this, the trial court was free to reject Jonathan's testimony as not being credible that he told the State that he wanted probation. *See Colyer*, 428 S.W.3d at 122 ("At a motion for new trial hearing, the judge alone determines the credibility of the witnesses."). The trial court was also free to reject Peters's characterization of the State's closing argument and to conclude it did not use Jonathan's name to get a higher sentence. *Id.*

Second, Peters argues that Jonathan changed his testimony and he now believed Dimitri was the first aggressor. Peters contends he showed he did not receive a fair trial and the trial court should have granted a new trial. As to the changed testimony, the trial court could have reasonably concluded that Jonathan's testimony was not credible and that it would not have changed the jury's finding. *Id.* Because the record before us does not establish that Jonathan's post-verdict testimony would probably bring about a different result, we hold that the trial court did not abuse its discretion

by permitting Peters's motion for new trial to be overruled by operation of law. *Frank v. State*, 183 S.W.3d 63, 71 (Tex. App.—Fort Worth 2005, pet. ref'd) (holding the trial court did not abuse its discretion in permitting appellant's motion for new trial to be overruled by operation of law when the record did not establish that witness's new testimony would probably bring about a different result).

We overrule Peters's seventh issue.

## VII. CONCLUSION

Finding no error, we affirm.

GINA M. PALAFOX, Justice

March 4, 2026

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)